IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

**JACOB RAPANT,**

    Plaintiff,

v.

**GRIZZLY INDUSTRIAL, INC.,**

    Defendant.

No. 6:22-cv-01200-AA

**OPINION & ORDER**

AIKEN, District Judge.

This case comes before the Court on a Motion for Summary Judgment, ECF No. 15, filed by Defendant Grizzly Industrial, Inc. The Court concludes that this motion is appropriate for resolution without oral argument. For the reasons set for the below, the motion is GRANTED and this case is dismissed. All other pending motions are MOOT.

## LEGAL STANDARD

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury

could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630-31.

## BACKGROUND

Plaintiff is a carpenter. When he was in school, Plaintiff took woodshop classes where he learned that the "Number 1 rule" for operating power tools was "if there's anything going on with the machine, turn it off." Def. Mot. Ex. A, at 46. Plaintiff completed a four-year apprenticeship through a carpenter's union and is employed as a journeyman carpenter with a Portland-based contracting company. *Id.* at 4, 7-8. Plaintiff has been working in carpentry since 2014. *Id.* at 5. Plaintiff also has a workshop in his home where he does woodworking for furniture and cabinets as a hobby and as a side job. *Id.* at 10, 16-17.

Defendant Grizzly Industrial, Inc. is a Washington corporation. Notice of Removal, ¶ 5. ECF No. 1. Relevant to this case, Defendant manufactures the G0505 Benchtop Planer and, as an accessory to the planer, the H7516 dust hood. Def. Mot. Ex. D., Baliola Decl. ¶¶ 4-6. Defendant first began producing the G0505 planer in 2003 and has sold 17,568 planers. *Id.* at ¶¶ 9-10. Defendant first began producing the H7516 dust hood in 2005 and has sold 5,012 dust hoods. *Id.* at ¶¶ 11-12. Until Defendant was notified of Plaintiff's injury, Defendant "had never received a report of any injury to anyone related to the G0505 Benchtop Planer or the H7517 dust hood." *Id.* at ¶ 13.

Plaintiff purchased the G0505 half benchtop planer in October 2020. Def. Mot. Ex. A, at 6-7, 10; Ex. B. The planer has a cutter head with sharp knives that are used to plane boards. Def. Mot. Ex. A, at 23-24. When the planer is in use it is very loud, and the blades spin at 10,000 RPM. *Id.* at 24. Plaintiff testified that once the planer was turned off it would take approximately fifteen seconds for the cutter heads to come to a stop. *Id.* at 26. Plaintiff testified that he was aware that the cutter head blades would cut flesh as easily as wood and that it would be dangerous to put his hands near the cutter head. *Id.* at 24-25.

When Plaintiff was setting up the planer, he read the instruction manual, including the warnings. Def. Mot. Ex. A, at 11-12. On the instructions for the planer, there is a warning to "Always disconnect machine from power supply before servicing, adjusting, or changing cutting tools." *Id.* at 26; Def. Mot. Ex. C, at 10. Plaintiff testified that he was aware of that warning. Def. Mot. Ex. A, at 26. Plaintiff also

testified that he was aware that "servicing" meant "doing anything to fix" the planer. *Id.*

The instructions also warn: "To avoid serious personal injury from spinning knives never remove guards or reach inside the planer when it is connected to power." Def. Mot. Ex. A, at 27; Ex. C, at 11. Plaintiff testified that he had read that warning and knew never to reach inside the planer when the planer was connected to power. Def. Mot. Ex. A, at 27. When asked if he took any action a result of the warnings, Plaintiff responded "I unplugged it when it wasn't in use." *Id.* at 12.

The planer came with a chip deflector, which shoots chips out of the back of the planer. Def. Mot. Ex. A, at 13. Plaintiff assembled and attached the chip deflector to the planer. *Id.* Plaintiff also bought the H7516 dust hood attachment for the planer, which captured the dust from the planer's operation. *Id.* at 25, 28-29; *see also* Def. Mot. Ex. C, at 23 (showing the H7516 Dust Hood "Made especially for the Model G0505 Planer, this complementing dust hood takes the place of the rear chip deflector."). Before Plaintiff installed the dust hood, the chips would simply fall on the floor when he used the planer. Def. Mot. Ex. A, at 22. Once the dust hood was in place, it sat "about an inch" above the planer's cutter head. *Id.* at 31. Plaintiff knew how close the cutter head was to the dust hood because he had installed the dust hood. *Id.*

Plaintiff uses the planer to make furniture and estimated that he used it for between two and four hours per piece and that he would typically make one piece per month. Def. Mot. Ex. A, at 18. In total, Plaintiff estimated that he had used the

planer for between thirty and forty hours at the time of the accident. *Id.* at 19. Plaintiff testified that the planer required little in the way of daily maintenance other than blowing the dust off with a small leaf blower. *Id.* at 15-16. After installing the dust hood, Plaintiff used the planer for several months, totaling between six and twelve hours, without any problems. *Id.* at 32.

On August 2, 2021, Plaintiff was using the planer to plane maple boards. Def. Mot. Ex. A, at 34. While the planer was in use, Plaintiff noticed that no dust was coming out of the hose attached to the dust hood. *Id.* at 35. Plaintiff reached into the planer and tapped the dust hood twice while the planer was running. *Id.* at 35, 37-38. The dust hood flexed down far enough that it caught the blade of the cutter head, which pulled the dust hood down into the blades and pulled Plaintiff's hand along with it. *Id.* at 35. Plaintiff pulled his hand out and turned the planer off and saw that his hand "was just covered in blood." *Id.* All four of Plaintiff's fingers were injured by contact with the planer's blades. *Id.* at 39.

At his deposition, Plaintiff testified that he knew that the dust hood was very close to the cutter head and that he knew the planer was running at the time. Def. Mot. Ex. A, at 36. Plaintiff also testified that he knew he could have dealt with the situation by turning the planer off and waiting for the blades to stop moving. *Id.* at 37-38.

Plaintiff testified that the injury occurred when he was "in the process of fixing the machine, not operating it," and that, had he pushed the off button, he would not

have been injured. Def. Mot. Ex. A, at 40-41. Plaintiff acknowledged that he acted contrary to the clear warnings in the planer manual. *Id.* at 45.

On August 3, 2021, Plaintiff emailed Defendant to describe the incident and complain about the "poor quality of the dust hood in collection of dusty and quality of material the product is made from." Def. Mot. Ex. H. In his email, Plaintiff remarked "I'm aware of the operator error on my part. I just want to inform you as a company of the injury I sustained during use of your product." *Id.*

This case was originally filed in the Marion County Circuit Court on July 6, 2022, and was removed to this Court by Defendant on August 15, 2022. ECF No. 1.

## DISCUSSION

Plaintiff alleges that the G0505 planer and the H7516 dust hood manufactured by Defendant were defective and that Defendant should be strictly liable for Plaintiff's injuries. Compl. ECF No. 1-1.

Under Oregon law, a plaintiff may bring a "product liability civil action," which is defined as:

> [A] civil action brought against a manufacturer, distributor, seller or lessor of a product for damages for personal injury, death or property damage arising out of:
>
> (1) Any design, inspection, testing, manufacturing or other defect in a product;
>
> (2) Any failure to warn regarding a product; or
>
> (3) Any failure to properly instruct in the use of a product.

ORS 30.900.

With respect to strict product liability, Oregon law provides that "[o]ne who sells or leases any product in a defective condition unreasonably dangerous to the user or consumer or to the property of the user or consumer is subject to liability for physical harm or damage to property caused by that condition if: (a) The seller or lessor is engaged in the business of selling or leasing such a product; and (b) The product is expected to and does reach the user or consumer without substantial change in the condition in which it is sold or leased." ORS 30.920(1). The Oregon legislature made clear in the statute that this rule "shall be construed in accordance with the Restatement (Second) of Torts sec. 402A, Comments a to m (1965)." ORS 30.920(3).

> Under Oregon law,
>
> [T]he necessary elements of a design defect cast are: (1) the sale or leasing of a product by one engaged in the business of selling or leasing such products; (2) a product that was expected to, and did, reach the user or consumer without substantial change in condition; (3) a product that, when sold, was in a defective condition unreasonably dangerous to the user or consumer; (4) injury to the user or consumer, or damage to his or her property; (5) that was caused by the product's defective condition.

*McCathern v. Toyota Motor Corp.*, 332 Or. 59, 77 n.15 (2001).

"In addition to presenting proof as to the condition of the defendant's product, the plaintiff in a strict liability case is required to establish that such condition proximately caused his injuries or damages." *Gilmour v. Norris Paint & Varnish Co.*, 52 Or. App. 179, 184 (1981) (internal quotation marks and citation omitted). Defendant contends that Plaintiff's injury was not caused by any defect in the design of the planer or dust hood but was instead caused by Plaintiff's misuse of the

planer and dust hood. Consistent with the requirement of ORS 30.920(3) that strict liability be construed in accordance with the Restatement and comments and, here, Defendant frames its motion around comments h and j of the Restatement.

Comment h to the Restatement provides that "[a] product is not in a defective condition when it is safe for normal handling and consumption." Restatement (Second) of Torts, § 402A, cmnt. h (1965). The comment provides additional guidance and examples:

> If the injury results from abnormal handling, as where a bottled beverage is knocked against a radiator to remove the cap, or from abnormal preparation for use, as where too much salt is added to food, or from abnormal consumption, as where a child eats too much candy and is made ill, the seller is not liable. Where, however, he has reason to anticipate that danger may result from a particular use, as where a drug is sold which is safe only in limited doses, he may be required to give adequate waning of the danger (see Comment *j*), and a product sold without such warning is in a defective condition.

Restatement (Second) of Torts § 402A, cmnt. h.

Comment j of the Restatement, in turn, provides: "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." Restatement (Second) of Torts, § 402A, cmnt. j. "Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous." *Id.*

"'(W)here a proper warning is given, as by instructions on the products container, the manufacturer or seller is normally not liable on the ground of

negligence for product-caused injury where the warning or instructions have been disregarded and where it appears that the injury would not have occurred had they been observed . . . and no recovery under the doctrine of strict liability in tort, where the gist of the action is an alleged failure to give adequate warning, but it is shown that a proper warning was actually given.'" *Schmeiser v. Trus Joist Corp.*, 273 Or. 120, 132 (1975) (quoting 2 Hursh and Bailey, American Law of Products Liability 212-213, § 8:25 (2d ed. 1974) (alterations in original)). In *Schmeiser*, the Oregon Supreme Court reversed the trial court's decision to deny the defendant's motion for directed verdict in a claim for strict liability:

> We do not believe that the strict liability doctrine means that under circumstances such as we have here a consumer may knowingly violate the plain unambiguous instructions and ignore the warnings, then hold the makers, distributors and sellers of a product liable in the face of the obvious misuse of the product.

*Schmeiser*, 273 Or. at 136 (quoting *Proctor & Gamble Mfg. Co. v. Langley*, 422 S.W.2d 773, 780 (Tex. Civ. App. 1967)).

Here, as noted, Defendant contends that Plaintiff's injury was the result of his own misuse of the planer, which was done contrary to the express warnings that accompany the planer. Misuse is normally a jury question unless "reasonable minds could not differ, which instance the case would be at an end." *Newman v. Utility Trailer & Equip. Co., Inc.*, 278 Or. 395, 399 (1977). The Oregon Supreme Court has held that, in the context of comment h to § 402A, "'abnormal' use does not mean every instance of negligence, however slight in connection with the use of the product." *Findlay v. Copeland Lumber Co.*, 265 Or. 300, 306 (1973). "The product

must be safe for 'normal' handling and consumption," and "[m]issue, to bar recovery, must be a use or handling so unusual that the average consumer could not reasonably expect the product to be designed and manufactured to withstand it—a use which the seller, therefore, need not anticipate and provide for." *Findlay*, 265 Or. at 306.

The adequacy of a warning also "ordinarily is a jury question." *Purdy v. Deere and Co.*, 311 Or. App. 244, 264 (2011). A warning "should give fair and adequate notice of the possible consequences of misuse," and "a warning is adequate when it is in such a form that it could reasonably be expected to catch the attention of the reasonably prudent person in the circumstances of its use and the content of the warning is of such a nature as to be comprehensible to the average user and to convey a fair indication of the nature and extent of the danger to the mind of a reasonably prudent person." *Id.* (internal quotation marks and citations omitted, alternations normalized).

In support of its motion, Defendant points to the Oregon Supreme Court's decision in *Askew v. Howard-Cooper Corp.*, 263 Or. 184 (1972). In *Askew*, the plaintiff was injured while greasing a log-lifting and handling machine called a "lumberjack." *Askew*, 263 Or. at 185-86. The plaintiff was instructed by his employer to set the lumberjack's boom to a certain height and then climb ten feet up to the top of the lumberjack to grease the fittings. *Id.* at 186. The plaintiff was injured while climbing back down when he slipped on a hose coupling and fell to the ground. *Id.* The plaintiff argued that "the failure to make the fittings accessible

from the ground or to provide some safe means of access to the boom rendered the machine unreasonably dangerous." *Id*. The Oregon Supreme Court held that "[r]outine servicing is unquestionably within scope of the uses for which a product is manufactured." *Id.* at 187.

However, the record in *Askew* showed that the fittings could be brought down far enough that they could be serviced with the assistance of "[a] solid place to stand, three feet high, like a log, a platform, or short ladder," which would "have solved the problem." *Askew*, 263 Or. at 187. The trial court granted non-suit and the Oregon Supreme Court affirmed, observing that the "manufacturer should not be required to anticipate that the purchaser will direct his employees to follow an obviously dangerous method of servicing equipment (as the purchaser did in the present case) when safe methods are readily apparent and available." *Id*. With respect to the plaintiff's strict liability claim, the court held:

> In order to be unreasonably dangerous so as to substantiate strict liability on the part of the seller, it must be shown that the article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.
>
> It is our belief that, as a matter of law, we can say that the community would not condemn a machine as unreasonably dangerous which could be serviced in the manner described and without the necessity of climbing ten feet off the ground.

*Askew*, 263 Or. at 188.

Here, Defendants contend that they should not be held strictly liable for Plaintiff's injury when, as in *Askew*, there was a readily apparently and available method of servicing the planer and dust hood that did not involve Plaintiff sticking

Page 11 – OPINION & ORDER

his hand into the still-running machine—namely that Plaintiff could have simply turned the planer off before attempting to clear the dust hood. Plaintiff acknowledged as much in his deposition:

> Q: You agree that had you turned it off that the dust hood could have been serviced in a perfectly safe manner?
>
> A: I agree.

Def. Mot. Ex. A, at 443; and

> Q: And the reason you told Grizzly that "I'm aware of operator error on my part" is that you knew that you had made a mistake?
>
> A: I should have turned the machine off. I did not know the hood would flex enough to catch the blade.

Def. Mot. Ex. A, at 42.

With respect to the warnings, the planer's safety instructions advise that the user must "[a]lways disconnect machine from power supply before servicing, adjusting, or changing cutting tools." Def. Mot. Ex. C, at 10. It is not disputed that Plaintiff read and understood those warnings, as he acknowledged in his deposition:

> Q: And you see where it says, "Disconnecting power supply. Always disconnect machine from power supply before servicing, adjusting or changing the cutting tools."
>
> A: Yes.
>
> Q: Do you see that? Were you aware of that warning?
>
> A: Yes.

Def. Mot. Ex. A, at 26; and

> Q: You do agree that the warnings that were given by Grizzly on the manual and on the label itself warned to turn off the power when servicing, adjusting, or performing maintenance?
>
> A: Yes.
>
> Q: An that's clear and unambiguous that you should have turned the machine off, and that's why you told Grizzly there was operator error; correct?
>
> A: Yes.
>
> Q: So you agree that you violated the warnings, instructions in the manual and on the planer?
>
> A: Yes. I should have turned the machine off.

Def. Mot. Ex. A, at 44-45.

Although Plaintiff disputes whether he was "servicing" the planer at the time of his injury, in his deposition, Plaintiff testified:

> Q: And you understood that servicing meant doing anything to fix it?
>
> A: Yes.

Def. Mot. Ex. A, at 26; and

> Q: And you were in the process of fixing the machine, not operating it; correct?
>
> A: Correct.
>
> Q: And that's what you meant by, "I'm aware of operator error on my part?"
>
> A: Yes.

Def. Mot. Ex. A, at 41.

In sum, Plaintiff acknowledged in his deposition that, by reaching into the planer while it was running, he acted contrary to the warnings that accompany the planer; contrary to his own training; and contrary to his own prior practice in using the planer. This case is an even clearer instance of misuse than *Askew* because, unlike that case, Plaintiff did not need to rely on the aid of some additional piece of equipment like a stepladder to safely service the planer and dust hood—he could have simply turned the machine off.

Considering the record, and in particular Plaintiff's own admissions, the Court concludes that no reasonable jury could find that Plaintiff's injury was caused by anything other than his own abnormal use of the planer. Defendant is therefore entitled to summary judgment.

## CONCLUSION

For the reasons set forth above, Defendant's Motion for Summary Judgment, ECF No. 15, is GRANTED. Final judgment shall be entered accordingly and all other pending motions are denied as MOOT.

It is so ORDERED and DATED this  19th  day of October 2023

                                  /s/Ann Aiken
                                  ANN AIKEN
                                  United States District Judge